UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EB SAFE, LLC,                                     :
                                                  :
                Petitioner,    :   **Civil Action No.**
                                                  :
        v.                                :
                                                  :
MARK P. HURLEY,                                   :
                                                  :
                Respondent.    :
                                                  :
------------------------------------------------------------x


**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO VACATE ARBITRATION AWARD**


                              **CONSTANTINE CANNON LLP**

                              Amianna Stovall
                              Joel A. Chernov
                              335 Madison Avenue, 9th Floor
                              New York, NY 10017
                              (212) 350-2700

Dated: August 14, 2017

405630.1

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTS .................................................................................................................. 2

    The Relevant Provisions Of The LLC Agreement ........................................................ 2

    Hurley Misrepresented And Failed To Disclose Third Party Interest In the Company .............. 3

    Based On Its Lack Of Knowledge EB Sent The Waiver ............................................... 7

    The Award ...................................................................................................................... 8

ARGUMENT ............................................................................................................................... 8

    THE PANEL MANIFESTLY DISREGARDED DELAWARE LAW
    IN FINDING THAT EB WAIVED ITS CALL ............................................................. 8

CONCLUSION .......................................................................................................................... 13

# TABLE OF AUTHORITIES

*AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428 (Del. 2005) ...................................9

*Chemical Bank v. Layne*, 423 F. Supp. 869 (S.D.N.Y. 1976) .......................................................12

*James J. Gory Mech. Contr., Inc. v. BPG Residential Partners V, LLC*,
    No. 6999-VCG, 2011 Del. Ch. LEXIS 200 (Del. Ch. Dec. 30, 2011) ......................................9

*Klein v. Am. Luggage Works, Inc.*, 158 A.2d 814 (Del. 1960) .......................................................9

*Moore v. Travelers Indemnity Ins. Co.*, 408 A.2d 298 (Del. Super. 1979) ...................................10

*Seaford Machine Works ex rel. Pennsylvania v. Johnson*, No. 95A-08-004,
    1996 Del. Super. LEXIS 134 (Del. Super. Ct. Apr. 1, 1996) ............................................10, 13

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85 (2d Cir. 2008)),
    *overruled on other grounds*, 559 U.S. 662 (2010) ....................................................................9

*Turner v. Bernstein*, 776 A.2d 530 (Del. Ch. 2000) .....................................................................10

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200 (2d Cir. 2002) ................................9

405629.1

Petitioner, EB Safe, LLC ("EB"), respectfully submits this Memorandum of Law in support of its request that the Court vacate an arbitration award issued by the International Institute for Conflict Prevention & Resolution on August 7, 2017 (the "Award").[1]

## PRELIMINARY STATEMENT

The central question in the arbitration (the "Arbitration") involving EB and Respondent, Mark P. Hurley ("Hurley"), was whether EB knowingly waived its "Call Right." EB and Hurley are members of Fiduciary Network, LLC ("Fiduciary Network" or the "Company"). The parties' rights and obligations are governed by the Third Amended and Restated Limited Liability Company Operating Agreement of Fiduciary Network, LLC, dated as of July 16, 2016 (the "LLC Agreement").[2] The LLC Agreement provides that EB may acquire the Company pursuant to its Call Right after ten years or in the event Hurley should seek to trigger a sale of the Company pursuant to his "Forced Sale Right." EB submits that the Arbitration Panel (the "Panel") manifestly disregarded applicable Delaware law in finding that EB waived its Call Right, by sending an email, dated November 22, 2016 (the "Waiver") that stated, in relevant part, "We would not exercise option [*i.e.*, the Call Right] if you trigger [*i.e.*, exercise the Forced Sale Right]."

At the time that it sent the Waiver, EB did not have knowledge of all of the material facts relevant to the decision of whether to exercise or waive the Call Right. Specifically, EB did not know that certain sovereign wealth and private equity funds had interest in investing in the Company. If EB had known those material facts, it would not have sent the Waiver.

---

[1] *See* Exhibit 1 to the accompanying Declaration of Joel A. Chernov, dated August 14, 2017. All other exhibits referenced herein are annexed to the Chernov Declaration.

[2] All capitalized terms herein that are not otherwise defined have the definitions set forth in the LLC Agreement. *See* Ex. 2 (EB 136).

**RELEVANT FACTS**

**The Relevant Provisions Of The LLC Agreement**

In 2006, Hurley, EB, and certain others founded the Company. It was agreed among the parties that EB would provide all of the Company's financing and that Hurley, as the CEO, and his senior management team (the "Management Team"), would be responsible for the Company's day-to-day operations. Since then, EB has provided financing in excess of $200 million.[3]

The LLC Agreement provides that EB may acquire Hurley's interests in the Company on or after December 1, 2017, pursuant to its Call Right within sixty (60) days of sending a "Call Right Notice" at the "Call Purchase Price" (which is a formula set forth in the LLC Agreement) *See* Ex. 2, §§ 7.4 and 7.5. It also provides that Hurley (or an entity controlled by him) has a Forced Sale Right which permits him to compel the Company's Board to initiate a formal Sale Process of the Company. *See id.*, § 7.3(a) and (b). EB may exercise its Call Right *before* December 1, 2017 *if* Hurley invokes his Forced Sale Right. *See id.*, § 7.4(a). In the event that Hurley exercises his Forced Sale Right and EB elects *not* to exercise its Call Right, EB retains a right of first refusal ("ROFR"), pursuant to which it may match the bid of any prospective purchaser in the Forced Sale Process. EB's ROFR, however, is subject to the Company's payment of break-up and investment banking fees. *See id.*, § 7.3.

---

[3] During the relevant time frame, the ownership of the Company was broken down as follows: (i) the Class A Interests, amounting to 57.625% of the Company, were owned by EB; (ii) the Class B Interests, amounting to 17% of the Company, were owned by Virgo-Fiduciary, LLC ("Virgo"); and (iii) the Class C Interests, amounting to 25.375% of the Company, were owned by Hurley and his related entities (18.9%), along with three senior members of the Management Team (6.47%). The Company's Board consisted of seven "Managers," with three designated by EB, two designated by Virgo, and two designated by Hurley and the other owners of the Class C Interests. *See id.*, §§ 6.2(a)(i) and (ii). The EB designated Managers participated in the approval of all loans and amendments to loans, all personnel matters, and the approval of budgets. Virgo ultimately sold its interests to EB at which point EB acquired majority control of the Board.

The Sale Process prescribes the only methods by which a sale of the Company may take place – eliminating, for example, the risk to EB of a management-led buyout – and requiring all owners to participate in a cash sale for 100% of the Company as expressly articulated by the LLC Agreement. *See id.*, § 7.3.

**Hurley Misrepresented And Failed To Disclose Third Party Interest In The Company**

In early 2016, Hurley spoke with Barry Friedberg ("Friedberg"), a member of the Company's Board appointed by EB, to request EB's permission to talk with a number of sovereign wealth funds in order to educate them prior to a possible Sale Process. Ex. 4 (Tr. 22:21-25:18; 909:17-21). Hurley told Friedberg that sovereign wealth funds might be the most logical buyer for the Company, but that they would need significant lead time to participate in the Sale Process. *Id.* (Tr. 788:14-21). Friedberg agreed to Hurley's request on the condition Hurley fully inform Friedberg of any resulting discussions. *Id.* (Tr. 22:21-25:18).

Unbeknownst to EB, Hurley proceeded to prepare a 70-plus page Confidential Information Memorandum (the "CIM") involving a management-led buyout proposal, accompanying financial models, summaries, and sales pitches. *See* Ex. 3 (MH 10). The CIM and the materials Hurley distributed contain financial models that support a purported equity value for the Company of $135-$175 million. *See* Ex. 4 (Tr. 948:6-10). While Hurley had promised to show EB any management-led buyout that he might prepare (*see* Ex. 18), he proceeded to distribute the CIM and these other materials without the knowledge or consent of EB and the Board. *See, e.g.,* Ex. 4 (Tr. 28:15-31:22, 46:16-48:6, 455:3-458:2, 515:23-517:24, 913:2-4, 948:5-22, 961:23-962:11, 965:12-18, 972:3-7, 975:25-977:9, 1117:21-24).

In particular, Hurley made contact with and showed the CIM, together with the financial models, to, at minimum, some or all of the following third-party potential investors: Abu Dhabi

Investment Council ("ADIC"), Ontario Teachers, OMERS, Mubadala, Temasek, Invus Opportunities ("Invus"), Hudson Hill Capital, Blackstone, Pinebrook Partners, Cranemere, Cynosure, Everwatch, Pritzker Organization, and MSD.  *See* Ex. 5. (EB2)

Hurley conceded that merely obtaining a meeting with the sovereign wealth and large family funds is difficult as well as significant, because these funds are "very thinly staffed, and everybody in the world is besieging them, trying to get money, and it is extremely hard to get a meeting, much less get an opportunity to get capital from them …."  *See* Ex. 4 (Tr. 788:14-21). Alain Lebec ("Lebec"), another Board member appointed by EB, similarly testified: "Most people have a lot of deals to look at.  They are not going to waste time watching a transaction or studying a transaction that they don't think makes sense for them." *See id.* (Tr. 652:18-22).

While Hurley purported to provide Friedberg and Lebec with the regular updates from his discussions and meetings, he never informed Friedberg, Lebec, or the Fiduciary Network Board that (i) he had obtained multiple meetings with representatives of various sovereign wealth and large family funds; and (ii) those representatives had reviewed the CIM and the accompanying financial models and had expressed an interest in continuing to meet and beginning to do due diligence.  *See* Exs. 3 and 5 (EB 2 and 10); *see also* Ex. 4 (Tr. 78:10-23, 455:20-456:25). Rather, he only told Friedberg and Lebec that he was getting little traction in his conversations, because of the Company's complicated debt/equity structure and due to the difficulty in replacing EB's debt. *See* Ex. 4 (Tr. 75:21-78:9) ("[N]ot getting any traction.  It's very difficult. You know, you have got silos in those organizations.  The guy who invests in equity, the guy who invests in debt, and they are not the same and don't talk to each other, so it is very difficult to get them to understand the opportunity that we offer.  We are having a hard time."), (Tr. 459:6-25).  EB thus could not evaluate the interest of the third parties in the Company, because

4

Hurley deliberately kept EB in the dark.

In particular, Hurley did not tell Friedberg and Lebec that he met with ADIC in May in Abu Dhabi and that meeting "went extraordinarily well." Ex. 6 (EB 76). He also did not tell Friedberg and Lebec that, in September, senior ADIC representatives traveled to Dallas to meet with Hurley and his colleagues and that afterwards "ADIC … signaled that they want to go to next step." *See* Ex. 7 (MH 179) (*i.e.*, begin due diligence); *see also* Ex. 4 (Tr. 965:12-18) (Hurley conceded that he never told EB about ADIC), (Tr. 989:11-990:10).

Hurley similarly chose not to inform Friedberg and Lebec of Virgo's meetings in October with Mubadala and its report that it had an excellent 90 minute meeting with the head of Mubadala capital, the head of private equity, and the head of credit. *See* Ex. 7 (MH179); *see also* Ex. 4 (Tr. 988:22-989:10). As Friedberg explained, such information would have been particularly material because Hurley had reported that "he was having difficulty in getting the equity and credit people together. So here was significant change…. It meant that there was a possibility that these folks were getting an understanding of the business that others had not been able to reach." Ex. 4 (Tr. 147:4-148:16). As Friedberg also explained: "it would have been significant [for] me to know that someone of Mubadala's size and wherewithal had taken a serious interest in the business, and they had the right people involved." *Id.* (Tr. 148:19-24).

The fact that these entities continued to invest considerable time and resources, including having their senior personnel travel to Dallas, after seeing the CIM with the $135 to $175 million valuation, is also material information that would have been relevant to EB's decision as to whether to send the Waiver. *See* Ex. 4 (Tr. 136:4-150:14). Indeed, the fact that Hurley concealed it, by itself, establishes its materiality. To use an analogy from the real estate market: If a person believes that their house is worth $5 million – and that person hires a broker and the

broker recommends putting the home on the market for $10 million – it is material information for the homeowner that someone came and looked at the house at that $10 million asking price. And, it is particularly material if that potential buyer asks to come for a second visit with their spouse. *See* Ex. 4 (Tr. 528:4-529:15). So too here, the fact that ADIC had been told that the Company had an equity value of $135 to $175 million and was willing to come to Dallas after meeting with Hurley in Abu Dhabi was material information that would have been relevant to EB's decision as to whether to exercise its Call Right or send the Waiver.

EB also did not know that Invus "cold called" Hurley about potentially investing in/acquiring the Company in September 2016. *See* Ex. 8 (EB 31) at Hurley0004370. When management receives such an inquiry, notifying the Board is standard practice. *See* Ex. 4 (Tr. 139:24-141:22, 542:10-13, 544:10-545:19).[4] Here, it is undisputed that Friedberg, Lebec, and the Board did not know of Hurley's meeting with Invus in New York on September 28, even though that meeting occurred immediately before the Board meeting. *See* Exs. 4 (Tr. 542:14-544:15, 972:10-973:5); 8 (EB 31) at Hurley0004367-70; and 9 (MH 81). It is also undisputed that Friedberg, Lebec and the Board did not know (i) that after meeting with Hurley, Ben Tsai ("Tsai") of Invus emailed Hurley stating "Great meeting you last week. I am back from my trip and debriefed with my partners. Everyone loved the strategy and we would be pleased to dig in" (*see* Ex. 8 (EB 31) at Hurley0004367); (ii) of Hurley's meeting with Invus on October 19 (*see* Ex. 5 (EB 2) at 3); and (iii) after the October 19 meeting, Tsai emailed Hurley asking if he could meet with at least one of the companies in which Fiduciary Network had invested and stated that he wanted "to continue moving the ball forward on diligence/deal as the Dec date approaches."

---

[4] An executive's failure to disclose an unsolicited request of the nature of Invus' to one's Board of Directors will typically result in the termination of that executive's employment. Ex. 4 (Tr. 141:6-8, 542:10-13) ("Every company I ever worked with, management gets an unsolicited offer. First thing, tell the board. Inform the board."), (Tr. 544:10-545:20).

*See* Ex. 10 (EB 27) at 0004241; *see also* Ex. 4 (Tr. 143:15-147:3). This information concerning Invus is material because it "shows that there is a serious buyer that has serious interest in the company." Ex. 4 (Tr. 144:3-11). Again, this is material information that Hurley concealed and that was relevant to EB's decision as to whether to exercise its Call Right or send the Waiver.

In August 2016, Hurley sent his friend, Eric Rosen of Hudson Hills, a copy of the CIM and asked him to keep it confidential, stating "I am managing [EB's] guys." *See* Ex. 11 (EB 173). Plainly, part of managing EB's guys (Friedberg and Lebec) meant misrepresenting the interest of potential third party investors. In that regard, despite his earlier promise, Hurley did not show EB the management-led buyout proposal that he prepared; he misrepresented the interest that at least certain of the sovereign and large family funds such as ADIC, Mubadala, and Invus appeared to have interest in the Company; and he failed to inform EB that ADIC was prepared to start doing due diligence and Invus had begun doing due diligence.

**Based On Its Lack Of Knowledge EB Sent The Waiver**

In November 2016, Hurley advised Friedberg that he intended to exercise his Forced Sale Right. Friedberg requested that Company management calculate the Call Purchase Price. At Hurley's request, the CFO made the calculations and informed Friedberg that the Call Purchase Price was $27.5 million. *See* Exs. 4 (Tr. 79:24-80:4) and 12 (MH91). EB then reasonably believed that it would be less costly to acquire the Company with the ROFR rather than the Call Right, an understanding supported by Hurley's misrepresentations concerning the interest that the sovereign wealth and private equity funds had in the Company. *See* Ex. 4 (Tr. 81:16-82:24, 90:9-91:10); *see also* (Tr. 466:7-467:11), (Tr. 569:15-19) ("I was convinced … that the ROFR was a better protection and cheaper protection based on my sense of values than exercising the [Call Right]").

In reliance on the materials and information that Hurley and his representatives had provided to Friedberg and Lebec, and without knowledge of the foregoing material third party interest in the Company, Friedberg sent the Waiver. *See* Ex. 13 (MH97).

On November 22, 2017, Hurley, issued a Forced Sale Notice in accordance with the notice provisions of the LLC Agreement, effective December 1, 2016. *See* Ex. 14 (MH98). On December 19, 2016, 19 days after the Forced Sale Notice became effective, by certified mail sent to the addresses listed in the LLC Agreement, EB exercised its Call Right. *See* Ex. 15 (EB94). By letter dated December 22, 2016, Hurley disputed the validity of EB's Call Right exercise, and, by letter dated December 29, 2016, EB offered to withdraw its Call Right if Hurley would withdraw his Forced Sale Notice. *See* Ex. 16 (MH136). By letter dated, dated January 3, 2017, Hurley refused. *See* Ex. 17 (MH144).

**The Award**

On or about January 4, 2017, EB commenced the Arbitration. The Panel heard testimony over the course of three days in May and June 2016, and, after reviewing the parties' post hearing submissions, heard oral argument by conference call. On August 7, 2017, the Panel issued the Award. *See* Ex.1. As is relevant here, the Panel found that EB either had knowledge or constructive knowledge of all relevant material facts when it sent the Waiver and found in favor of Hurley.

## ARGUMENT

### THE PANEL MANIFESTLY DISREGARDED DELAWARE LAW IN FINDING THAT EB WAIVED ITS CALL RIGHT

In the Second Circuit, "manifest disregard" has three elements: (1) that "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators;"

8

405533.1

(2) "the law was in fact improperly applied leading to an erroneous outcome;" and (3) "the arbitrator must have known of its existence, and its applicability to the problem before him." *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93 (2d Cir. 2008) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389-90 (2d Cir. 2003)), *overruled on other grounds*, 559 U.S. 662 (2010).[5] The present case is not merely a "simple misinterpretation of contract" (*Stolt-Nielsen SA*, 548 F.3d at 92), but rather an obviously erroneous application of clearly applicable Delaware law concerning waiver. *See, e.g.*, *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 214 (2d Cir. 2002).

In Delaware, a waiver is not effective unless it is both knowing and intentional. In that regard, the "standards for proving waiver under Delaware law ... are 'quite exacting.'" *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428, 444 (Del. 2005) (citation omitted). As the court explained:

> Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights. The facts relied upon to prove waiver must be unequivocal.

*Id.* (internal quotations and citations omitted). In *Klein v. Am. Luggage Works, Inc.*, 158 A.2d 814, 818 (Del. 1960), the court similarly stated: "It is obvious that one cannot waive that of which he had no knowledge at the time of the alleged waiver." *See also James J. Gory Mech. Contr., Inc. v. BPG Residential Partners V, LLC*, No. 6999-VCG, 2011 Del. Ch. LEXIS 200, at *10-11 (Del. Ch. Dec. 30, 2011) ("[W]aivers of contractual rights are not lightly found. Under Delaware law, a waiver is the voluntary and intentional relinquishment of a known right . . . and

---

[5] In *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp*, 559 U.S. 662, 673 n.3 (2010) the Supreme Court left open the question of whether manifest disregard remains a ground for vacatur. ("We do not decide whether 'manifest disregard' survives our decision in [*Hall Street Associates*] as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at [FAA section 10].").

9

implies knowledge of all material facts, and intent to waive. A waiver must be unequivocal.") (citing *Wimbledon Fund LP-Absolute Return Fund Series v. SV Special Situations Fund LP*, 2010 Del. Ch. LEXIS 131, 2010 WL 2368637, at *4 (Del. Ch. June 14, 2010)); *Turner v. Bernstein*, 776 A.2d 530, 543 (Del. Ch. 2000) ("While the defendant directors have produced evidence that suggests that neither plaintiff was a helpless ingénue who accepted the merger consideration with blind faith in the [company's board], the defendants have not met their burden to show that either one of the named plaintiffs made their investment decision on a fully informed basis."); *Seaford Machine Works ex rel. Pennsylvania v. Johnson*, No. 95A-08-004, 1996 Del. Super. LEXIS 134, at *10 (Del. Super. Ct. Apr. 1, 1996) ("The party asserting waiver must put forth unequivocal facts that establish both knowledge of all the material facts on the part of both parties, and an intent to waive."); *Moore v. Travelers Indemnity Ins. Co.*, 408 A.2d 298, 301 (Del. Super. 1979) (a waiver "involves both knowledge and intent").

Here, in is undisputed that EB did not send the Waiver "on a fully informed basis." *Turner*, 776 A.2d at 543. In order for the Waiver to be effective under Delaware law, EB would have needed to know the following facts:

- Hurley had prepared the CIM and the accompanying financial models and was using those documents to solicit, *inter alia*, sovereign wealth and private equity funds to join in a management-led buyout.

- Invus cold called Hurley, had multiple meetings with Hurley, and had requested permission to begin due diligence and visit one of the Fiduciary Network's portfolio companies.

- ADIC and Mubadala had multiple meetings with Hurley and Virgo and were interested in continuing discussions about a potential investment in Fiduciary

Network.

Notwithstanding, as relevant here, the Panel found that (i) EB did not sufficiently seek to ascertain the scope of Hurley's activities throughout 2016 (*see* Ex. 1 at 30-31); and (ii) EB chose to waive the Call Right, because it "believed Hurley was bluffing" when in November 2016 Hurley told Friedberg he intended to exercise his Forced Sale Right if EB waived its Call Right (*id.* at 31).

While Friedberg had authorized Hurley to have preliminary discussions with sovereign wealth funds to develop their interest in acquiring the Company, EB had no reason to believe that Hurley had prepared a management-led buyout proposal (the CIM) and was using it to solicit the sovereign wealth and private equity funds. In that regard, as noted above, Hurley had agreed to show EB any management-led buyout proposal that he might prepare, but admittedly never did so. See Exs. 18 (MH38) and 4 (Tr. 28:15-31:22, 46:16-48:6, 455:3-458:2, 515:23-517:24, 948:5-22, 961:23-962:11, 965:12-18, 972:3-7, 975:25-977:9, 1117:21-24).

Further, it also is undisputed that Hurley purported to provide Friedberg with approximate monthly updates concerning his efforts to solicit the interest from the sovereign wealth funds. Ex. 4 (Tr. 74:15-78:9; 340:11-342:3). Likewise, Lebec specifically asked Hurley in September 2016 about the status of the discussions with the sovereign wealth funds. *Id.* (Tr. 459:12-460:14). Hurley reported to both Friedberg and Lebec that he was having trouble generating interest by reason of the Company's complicated debt and equity structure and the difficulty in replacing EB's debt. *See id.* (Tr. 75:21-78:9) ("[N]ot getting any traction. It's very difficult. You know, you have got silos in those organizations. The guy who invests in equity, the guy who invests in debt, and they are not the same and don't talk to each other, so it is very difficult to get them to understand the opportunity that we offer. We are having a hard time."),

459:6-25.

In these circumstances, the decision of the court in *Chemical Bank v. Layne*, 423 F. Supp. 869 (S.D.N.Y. 1976) is instructive. There, the defendant-guarantor sought to avoid his obligations under a guaranty governed by New York law asserting "several defenses based upon fraudulent concealment." *Id.* at 870. In considering the applicable standard for a "bank's duty of disclosure in cases" involving a guarantor or surety, the court concluded certain non-disclosures affected defendant's obligations while others did not. *Id.* at 877. Specifically, although the court found that Chemical Bank was not required to make disclosures concerning guaranties on other loans, if the guarantor "asked about the existence of other … loans and received misleading answers, the case would of course be quite different." *Id.* at 878. In that regard:

> [I]f inquiry is made by the guarantor, the bank's disclosure can[not] be less than complete. Certainly that is so where significant facts, relevant to the guarantor's inquiry, lie within the bank's knowledge, but do not lie "readily to hand" for the guarantor.

*Id.* at 879. The court further explained that the guarantor:

> had *already inquired* about the collateral. Under the pertinent cases, Chemical was under a duty to make full and complete disclosure to its intended guarantor. The bank cannot give an incomplete response to the initial inquiry and then argue that, precisely because the response was incomplete, [the guarantor] should have inquired further.

*Id.* at 881 (italics in original).

So too here, Friedberg and Lebec both asked Hurley about his discussions with the sovereign wealth funds and both received disclosures that were "less than complete." *Id.* at 879. As in *Chemical Bank*, Hurley could not give "an incomplete response" to EB's inquiries and then argue EB "should have inquired further." *Id.* at 881. EB had no reason to further question Hurley about his activities. In effect, by the Panel's reasoning, EB either had to assume Hurley was lying and inquire further or be forever foreclosed from making an informed waiver. Such

12

reasoning ignores applicable Delaware law. In short, Hurley failed to demonstrate and the Panel erroneously determined that he "'put forward unequivocal facts that establish[ed] ... [EB's] knowledge of all the material facts....'" Ex. 1 at 30 (quoting *Seaford Machine Works*, 1996 Del. Super. LEXIS 134, at *10).

## CONCLUSION

By reason of the foregoing, EB respectfully requests that the Court vacate the Award and remand the matter for a rehearing before a new panel of arbitrators and grant such other and further relief that the Court deems just and proper.

Dated: New York, New York
August 14, 2017

Respectfully submitted,

Amianna Stovall
Joel A. Chernov
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
(212) 350-2700

*Counsel for EB Safe, LLC*